IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Robert Wayne Humphrey, Jr.,  )<br>and Crystal Marie Humphrey,  )<br>                                              )<br>                        Plaintiffs,  )<br>                                              )<br>v.                                         )<br>                                              )<br>Day & Zimmerman International, Inc.,  )<br>                                              )<br>                        Defendant.  )<br>_____)  | C/A No. 6:12-1458-TMC<br><br>**ORDER** |

This matter is before the court on a summary judgment motion filed by Defendant Day & Zimmerman International, Inc. ("Defendant"). (ECF No. 29). Plaintiffs Robert Wayne Humphrey, Jr. ("Humphrey"), and Crystal Marie Humphrey (collectively "Plaintiffs") filed a response opposing the motion (ECF No. 31), and Defendant filed a reply (ECF No. 33). A hearing was held on the matter on October 3, 2013, and the court took the matter under advisement. For the reasons below, the court grants the motion.

**I. Background/Procedural History**[1]

This action arises out of an incident that occurred at Cytec Carbon Fibers, LLC, (Cytec"), a chemical plant in Greenville, South Carolina. Defendant contracted with Cytec to provide labor and maintenance at Cytec's facilities. On December 30, 2009, one of Defendant's employees, while attempting to remove a potable water line, negligently cut into a line containing Acrylonitrile ("AN"), a hazardous chemical used to manufacture carbon fiber. Subsequently, while attempting to remove the damaged AN line, Humphrey, a contract employee of Cytec, was injured after being exposed to AN.

---

[1] These facts are either undisputed or, where disputed, are stated in the light most favorable to Plaintiffs.

On December 30, 2009, two of Defendant's employees, Richard Lee Page ("Page") and Travis Palm ("Palm"), were at Cytec to replace a potable water line suspended with various other lines approximately fifteen feet above the floor of an uncovered, concrete diked area. The pipe was located in an area which was cramped and difficult to access. Additionally, the area was exposed to the weather, which on that day was extremely cold and rainy and, at times, sleeting. The water line that was to be removed ran parallel with a one-inch AN line that was surrounded by a two-inch water jacket. The AN and water lines were approximately the same size and looked similar. Defendant had not provided its employees any specific training on how to identify, mark, or cut lines. Because Page was in a hurry to complete the task before the end of the day and the upcoming holiday and failed to identify and mark the water pipes, Page accidentally cut approximately halfway into the AN line at approximately 1:00 p.m. AN began spraying five feet into the air. Page and Palm immediately informed the other workers in the area, and the area was evacuated. Page and Palm then reported the incident to Cytec's control room. The spill alarm was activated, and the valves to the AN line were closed at most thirty minutes later. It was estimated that enough AN was released to fill a 55-gallon drum between a quarter to half way up.

Both the Emergency Response Team ("ERT") at Cytec and the local Fire Department responded to the alarm. After 1½ hours, the Fire Department returned control of the site to Cytec. The concrete area was washed and testing of the air at ground level showed the air was okay from an atmospheric standpoint.[2]

During this time, Cytec employees had discussed how to repair or remove the AN line.

---

[2] The court notes that, in their response to Defendant's Summary Judgment Motion, Plaintiffs contend that the Fire Department did not normally perform air sampling. However, at the hearing, Plaintiffs clarified that the Fire Department never tested the air in the area where the pipe was located, and that area was still hazardous after the Fire Department left because AN was still present and the line needed to be repaired or removed.

Humphrey, and two other Cytec employees, Michael Partridge ("Partridge") and Bryan Maness ("Maness"), prepared to remove the AN line, and were instructed as to how the line should be removed and the personal protective equipment which would be needed.[3] Humphrey and the others knew some AN was on the insulation and more was still in the line which could be released during removal. Humphrey had received training about hazardous chemicals, including AN, and the use of air packs.

First, Humphrey and Partridge shaved in preparation for using the air packs and to ensure a good seal of their face masks. Humphrey then put on a white jumpsuit which was used for blowing dust, but Terry McCall, Cytec's Safety Engineer, insisted Humphrey change into a yellow chemical jumpsuit. Humphrey complied and also put on a pair of rubber boots, chemical gloves, a hard hat, and an air pack with a tank and full shield face mask. Humphrey, however, did not duct tape his wrists or ankles or pull the hood over his head, which he had been trained to do. Furthermore, the jumpsuit was too small for Humphrey.[4] At his deposition, Humphrey testified that he was not concerned about what he wore because he "looked at that chemical like it was a water," and he "didn't respect it."

At approximately 3:15 p.m., Humphrey, Partridge, and Maness began to remove the AN line. Maness remained on the ground, and Humphrey and Partridge with harnesses were elevated by scissor lifts so they could access the line. To remove the AN line, Humphrey and Partridge had to break the bolts holding the line. To do so, Humphrey had to access the flange which required reaching up and stretching over the AN line. At some point, Humphrey's jumpsuit ripped at the waist, and Humphrey used duct tape to fix it. Humphrey continued to

---

[3] As a contract employee, Humphrey wanted to be involved in the line's removal, which he viewed as an opportunity to impress his supervisors so that he might be considered for a permanent position at Cytec with a significant raise and benefits.

[4] Humphrey is 6'3" and weighed 313 pounds.

3

work on removing the AN line in the ripped jumpsuit for approximately four hours, and during this time, he often pulled up his pants at the waist through his jump suit.

As noted, the men wore air packs and face masks during the removal process. The tanks for the air packs had to be changed approximately every thirty minutes, and this was done, without removing their protective clothing or washing off. Additionally, Humphrey took a break for a drink and snack in the break room while still wearing his protective gear.

As Humphrey actually removed the AN line, AN ran out of the line like a fire hose and he testified he panicked. The AN went into his gloves, and at that time Humphrey's air pack alarm sounded alerting him that he had five minutes left of oxygen. By the time Humphrey was descending from the area, he was out of air, and he broke the seal between his mask and his face before he was out of the diked area. Humphrey washed his hands and face, and switched his air bottle and continued making the repairs. During the last 45 minutes of the removal, condensation began to develop on Humphrey's mask, and he again broke the seal around his face mask in an attempt to remove the condensation.

After the line was removed, Humphrey and Partridge washed the area and tools with water and showered. Humphrey noticed the skin on his hands and at his waist was irritated. Later, he developed blisters on his hands and waist. At approximately 8 p.m., Humphrey emailed Mike Garner, a Cytec Maintenance Unit Lead, to report that the AN line had been removed without any problems. Humphrey did not report that AN had gotten on his skin or request any medical attention.

The following day, Humphrey woke up weak and with a sore throat - like he had the flu. Humphrey went to work and continued to feel ill. On January 1, 2010, still not feeling well and after experiencing breathing problems, Humphrey went to the emergency room, but he left because there were too many other people waiting to be seen. On January 2, 2010, Humphrey's

condition worsened, and he felt as if his body was "shutting down." He returned to the emergency room, and he was admitted to the hospital where he stayed until Jan. 9th. He remained out of work until March. Humphrey continued to work at Cytec until September 2011, when he stopped working due to his health problems, including severe asthma.

Humphrey, now 38 years old, claims that as a result of his AN exposure, he has sustained permanent and severe injuries to his pulmonary, respiratory, and immune systems; incurred enormous medical bills and expenses; lost wages; experienced severe pain and suffering, mental anguish and emotional distress; a decrease in the quality of life; and is permanently and totally disabled from any future employment. Humphrey's wife, Crystal Humphrey, brings a claim for loss of consortium. Both are seeking actual and punitive damages.

## II. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996).

### III.  Discussion

Defendant moves for summary judgment on the grounds that: 1) Humphrey's own negligence proximately caused his injuries; 2) Humphrey impliedly assumed the risk; and 3) Humphrey's comparative negligence was the cause of his injuries. Humphrey alleges his injuries and damages were caused solely by the negligence of Defendant, and had Defendant not cut the AN line on December 30, 2009, Humphrey would not have been involved in the maintenance work during which he was exposed to the AN.  It is important to note that most of the facts are undisputed and Defendant admits Page was negligent in cutting the AN line. Further, the parties stipulated at the hearing that Defendant would not have been allowed to perform any of the repair or clean-up work.

**A. Proximate Cause**

Defendant contends that Plaintiffs have failed to establish that Defendant proximately caused Humphrey's injuries.  Specifically, Defendant contends that the Defendant's negligence in cutting the AN pipe was a remote cause of Humphrey's injuries and Humphrey's subsequent and intervening acts were the proximate cause of his injuries. Plaintiffs argue that summary judgment is improper in this case because there are genuine issues of material fact regarding the proximate cause of Humphrey's injuries.

To state a cause of action for negligence, a plaintiff must allege facts which demonstrate: (1) a duty of care owed by the defendant; (2) a breach of that duty by a negligent act or omission; (3) a negligent act or omission resulted in damages to the plaintiff; and (4) that damages proximately resulted from the breach of duty.  *Thomasko v. Poole*, 561 S.E.2d 597, 599 (S.C. 2002).[5] In determining whether a particular act is negligent, the standard is what a person

---

[5] Because this is a negligence action based on diversity jurisdiction, South Carolina law applies. *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994) (holding "[f]ederal courts in diversity cases

6

of ordinary reason and prudence would do under those circumstances at that time and place. *Berberich v. Jack*, 709 S.E.2d 607, 612 (S.C. 2011).

Proximate cause requires proof of: (1) causation-in-fact and (2) legal cause. *Bramlette v. Charter-Medical-Columbia,* 393 S.E.2d 914, 916 (S.C. 1990). To establish causation-in-fact, the plaintiff must show that the injury would not have occurred but for the defendant's negligence, and to establish legal cause, the plaintiff must show foreseeability. *Id*. The test of foreseeability is whether the injury is the natural and probable consequence of the alleged negligent act. *Koester v. Carolina Rental Ctr., Inc.*, 443 S.E.2d 392, 394 (S.C. 1994). "Where the injury complained of is not reasonably foreseeable there is no liability." *Crolley v. Hutchins*, 387 S.E.2d 716, 717 (S.C. Ct.App. 1989). Where intervening acts occur, the original wrongdoer may be liable despite intervening acts if the intervening acts are foreseeable, or if not foreseeable, if the original wrongdoer's acts "'would have caused the loss in natural course.'" *Young v. Tide Craft, Inc.*, 242 S.E.2d 671, 676 (S.C. 1978) (quoting *Benford v. Berkeley Heating Co.*, 188 S.E.2d 841 (S.C. 1972)). *See also Dixon v. Besco Eng'g, Inc.*, 463 S.E.2d 636, 640 (S.C. Ct.App. 1995) ("For an intervening act to break the causal link and insulate the tortfeasor from further liability, the intervening act must be unforeseeable.").

> The test, therefore, by which the negligent conduct of the original wrongdoer is to be insulated as a matter of law by the independent negligent act of another, is whether the intervening act and the injury resulting therefrom are of such character that the author of the primary negligence should have reasonably foreseen and anticipated them in light of attendant circumstances. The law requires only reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care there is no liability. One is not charged with foreseeing that which is unpredictable or that which could not be expected to happen. When the negligence appears merely to have brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct

---

apply the law of the forum state.").

7

or proximate cause, and the former only the indirect or remote cause.

*Gibson v. Gross*, 311 S.E.2d 736, 738-39 (S.C. Ct.App. 1984).

> While it is not necessary that the actor must have contemplated or could have anticipated the particular event which occurred . . . liability cannot rest on mere possibilities. The actor cannot be charged with "that which is unpredictable or that which could not be expected to happen." In determining whether a consequence is one that is natural and probable, the actor's conduct must be viewed "in the light of the attendant circumstances."

*Accordini v. Security Cent., Inc.*, 320 S.E.2d 713, 714 (S.C. Ct. App. 1984)(*citing Young v. Tidecraft*, 242 S.E.2d 671, 676 (S.C. 1978). *See also Stone v. Bethea*, 161 S.E.2d 171, 173 (S.C. 1968) ("One is not charged with foreseeing that which is unpredictable or that which could not be expected to happen. When the [original wrongdoer's] negligence appears merely to have brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause."). Proximate cause is generally a question of fact, unless the evidence is such that reasonable minds cannot differ. *See Bailey v. Segars*, 550 S.E.2d 910, 914 (S.C. Ct. App. 2001).

The issue in this case is whether it was foreseeable that Humphrey would fail to follow the proper safety precautions which were in place when he removed the damaged AN line. Humphrey argues that the inhalation of the AN was primarily a result of the movement of the face mask and the breaking of the face mask seal. Plaintiffs contend that it was foreseeable and would have been almost impossible for Humphrey to have kept his protective gear intact during the five hour repair in the cramped, elevated space with the cold and rainy weather conditions.

It is undisputed that Humphrey had knowledge of the dangers of the AN and the necessity of the proper safety precautions. (ECF No. 29-7 at 6, 1, 19-20).   Further, it is undisputed that Humphrey knew that AN had already contaminated the area and was present in

the insulation and the AN line he was removing and he would need personal protective gear in removing it. (ECF No. 29-7 at 15, 26-27). Terry McCall, Cytec's Safety Engineer, testified that he, Humphrey, Partridge, and others discussed that AN had gotten into the insulation and also remained in the cut line, and there was a risk of disturbing the AN during the pipe removal and the need to use personal protective gear. (ECF No. 29-5 at 20, 24, 26). McCall also testified that the Fire Department turned the area over to Cytec once it was determined that the area was under control and, at that point, the removal of the AN pipe became a maintenance activity and was not an emergency activity. (ECF No. 29-5 at 15-16, 18, 22).

Humphrey testified that he had received training on the proper usage of air packs. (ECF No.29-7 at 4). Further, he testified that he made all three of the men involved in the repair shave to ensure a good, sealed fit for the face mask. (ECF No. 29-2 at 11; ECF No. 29-7 at 22). However, it is undisputed that during the last 45 minutes or hour of the removal of the pipe, Humphrey broke the seal of his face mask several times in an effort to remove the condensation that had formed. (ECF No. 29-2 at 22, 44). Humphrey testified that he cracked the seal while allowing positive air out of his tank, believing that by doing so, he could not "suck in any poison." (ECF No. 29-2 at 24, 37). Humphrey also testified that in the approximately 200 jobs he has performed with air packs, this was the first time he had seen condensation inside his mask. (ECF No. 29-2 at 15, 22-23).

Contrary to Plaintiffs' contention, the evidence negates the existence of both causation in fact and legal cause as a matter of law. While it may have been foreseeable that the AN line would require removal, it was not reasonably foreseeable that Humphrey would attempt to remove the line without taking the proper safety precautions in the face of a known hazard. In performing this non-emergency repair work, Humphrey knew the AN was present and dangerous, and that he would have to take precautions to protect himself. (ECF No. ). However,

9

Humphrey broke the seal on his face mask several times while removing the AN line, and Humphrey left the diked area and ate a snack in the break room while still in his contaminated protective gear. (ECF No. 29-2 at 10-11, 22; ECF No. 29-10 at 13). As Humphrey testified, there should have been a decontamination area where he could have removed or washed off any contaminated equipment prior to removing his air pack. (ECF No. 29-2 at 19, 41). Humphrey failed to follow the proper safety procedures when he removed his face mask knowing AN was not only around him, but actually on his jumpsuit and other protective gear. Humphrey's actions were the proximate cause of his inhalation injuries. The court finds that there is no genuine issue of material fact as to the proximate cause of Humphrey's injuries. Humphrey's negligent conduct was the sole proximate cause of his injuries.

### B. Implied Assumption of the Risk

Defendant has also moved for summary judgment on the ground that Humphrey's conduct constitutes primary implied assumption of the risk of injury and bars all recovery. Plaintiffs contend that assumption of the risk is no longer applicable in South Carolina.

Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are inherent in a particular activity. *See Cole v. Boy Scouts of America,* 725 S.E.2d 476, 478 (S.C. 2011). The doctrine of primary implied assumption of risk "goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 508 S.E.2d 565, (S.C. 1998). Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff. *Id*. In primary implied assumption of risk the focus is not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. *Id*. Primary implied assumption of risk is simply another way of stating that a plaintiff has failed to establish

a prima facie case of negligence by failing to establish that a duty exists. *Id. See also McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 612 S.E.2d 462 (S.C. Ct. App. 2005).

"This situation has been most recognized where the plaintiff is a spectator or a participant in sporting events." *Cole,* 725 S.E.2d at 478. *See also Rolain v. Wal-Mart Stores, Inc.*, 2013 WL 1249624, *3 (D.Nev. 2013)(unpublished)(citations omitted). However, South Carolina courts have applied the doctrine in other situations. *See, e.g., Singleton v. Sherer*, 659 S.E.2d 196 (S.C. Ct. App. 2008)(personal injury action involving injuries sustained from a wild animal bite).

Citing *Davenport*, Plaintiffs contend that assumption of the risk is no longer a complete bar to recovery under South Carolina's comparative negligence scheme. However, in *Davenport*, while the court held the absolute defense of assumption of the risk is inconsistent with South Carolina's comparative negligence system, the court also stated "[e]xpress and primary implied assumption of risk remain unaffected by our decision." *Davenport*, 508 S.E.2d at 574.

As noted above, to establish a claim for negligence, a plaintiff must first show that the defendant owed a duty of care to the plaintiff. Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law. *Hurst v. East Coast Hockey League,* 637 S.E.2d 560, 562 (S.C. 2006). In South Carolina, "there are four requirements to establishing the defense of assumption of risk: (1) the plaintiff must have knowledge of the facts constituting a dangerous condition; (2) the plaintiff must know the condition is dangerous; (3) the plaintiff must appreciate the nature and extent of the danger; and (4) the plaintiff must voluntarily expose himself to the danger." *Davenport*, 508 S.E.2d at 569 (citing *Senn v. Sun Printing Co.*, 367 S.E.2d 456 (S.C. Ct.App.1988)). In addition, the "trial court may declare the plaintiff assumed the risk as a matter of law where it clearly appears that the plaintiff freely and

voluntarily exposed himself to a known danger and understood and appreciated the danger." *Broom v. Southeastern Hwy. Contracting, Inc.,* 352 S.E.2d 302, 306-07 (S.C. Ct. App. 1986).

As discussed above in regard to proximate cause, the undisputed facts establish Humphrey freely and voluntarily exposed himself to AN, which he clearly knew and appreciated was a known danger. Accordingly, the court finds Humphrey impliedly assumed the risk.

### C. Comparative Negligence

Alternatively, Defendant contends that even if Defendant's acts were a proximate cause of Humphrey's injuries, Humphrey's own overwhelming negligence was more than a fifty percent cause of his injuries.

In South Carolina, a plaintiff may only recover damages if his own negligence is not greater than that of the defendant. *Hurd v. Williamsburg County*, 611 S.E.2d 488, 492 (S.C. 2005). Ordinarily, comparison of the plaintiff's negligence with that of the defendant is a question of fact for the jury to decide. However, "[i]f the sole reasonable inference that may be drawn from the evidence is that the plaintiff's negligence exceeded fifty percent, the . . . court may determine judgment as a matter of law in favor of the defendant." *Bass v. Gopal, Inc.,* 680 S.E.2d 917, 922 (S.C. Ct. App. 2009)(citing *Bloom v. Ravoira*, 529 S.E.2d 710, 713 (S.C. 2000)).

The undisputed facts clearly show that Humphrey proceeded in the face of known danger and was negligent when he attempted to remove the AN line. Humphrey knew the dangers associated with AN and yet attempted to repair the AN line in a unsafe manner by not properly taping the wrist and ankles of his jumpsuit, removing his face mask while still in the diked area, taking a break while wearing contaminated gear, and breaking the seal to combat the

condensation.[6] Humphrey's fault in deliberately failing to take safety precautions to protect himself exceeded Defendant's fault. *See, e.g., Bloom,* 329 S.E.2d at 713 (finding, as a matter of law, plaintiff's own negligence was greater than any potential negligence by defendant, thus precluding his recovery in a negligence action); *Estate of Haley v. Brown*, 634 S.E.2d 62, 63 (S.C. Ct.App. 2006) (holding directed verdict proper where the "only reasonable inference that can be drawn from the evidence is that [plaintiff's] negligence in running into the side of [defendant's] truck outweighed any possible negligence by [defendant] and was the more determinative factor in causing the collision.").

The court finds Humphrey's negligence was, as a matter of law, greater than the negligence attributable to Defendant. Accordingly, Plaintiffs' claims are barred under the doctrine of comparative negligence.

### IV. Conclusion

For the foregoing reasons, Defendant's Summary Judgment Motion (ECF No. 29) is **GRANTED**.

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

Anderson, South Carolina
January 31, 2014

---

[6]Humphrey has stipulated that he is not seeking any damages for claims relating to skin blisters, burns, or scars. Humphrey has decided to concentrate on his inhalation injuries.